1  **Tomas A. Guterres, Esq. (State Bar No. 152729)**
2  **Catherine M. Mathers, Esq. (State Bar No. 221983)**
3  **Erin R. Dunkerly, Esq. (State Bar No. 260220)**
   **Christian E. Foy Nagy, Esq. (State Bar No. 231536)**
4  **COLLINS COLLINS MUIR + STEWART LLP**
   **1100 El Centro Street**
5  **South Pasadena, CA  91030**
6  **(626) 243-1100 – FAX (626) 243-1111**
   **Email:  tguterres@ccmslaw.com**
7  **Email:  cmathers@ccmslaw.com**
8  **Email:  edunkerly@ccmslaw.com**
   **Email:  cnagy@ccmslaw.com**
9  Attorneys for Defendants, COUNTY OF LOS ANGELES, DEPUTY DAVID
10 CHEVEZ and DEPUTY LAWRENCE SWANSON, JR.

11                    **UNITED STATES DISTRICT COURT**

12                 **CENTRAL DISTRICT OF CALIFORNIA**

13

14 N.G. AND L.G., minors, by and          )  CASE NO. CV13-008312-SVW(FFMx)
   through their Guardian ad Litem,       )  *[Assigned to Judge Stephen V. Wilson,*
15 Lilliana Magallon; SARA PEREZ,         )  *Courtroom 6]*
                                          )
16                 Plaintiffs,            )  **OPPOSITION TO PLAINTIFFS'**
17                                        )  **MOTION IN LIMINE NO. 1 RE:**
                                          )  **EXCLUDE DECEDENT'S TATTOOS**
18      vs.                               )
                                          )
19 COUNTY OF LOS ANGELES;                 )  **PRETRIAL CONF: July 28, 2014**
20 LEROY BACA, DEPUTIES DAVID             )  **TIME:            3:00 p.m.**
   CHEVEZ and LAWRENCE                    )  **COURTROOM:  6**
21 SWANSON, JR.; GOMEZ, KELLY-            )
22 EKLUND, AND DOES 5 – 10,               )  **Trial Date:    August 12, 2014**
                                          )
23                 Defendants.            )
                                          )
24 _____       )

25

26 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

27        Defendants COUNTY OF LOS ANGELES, DEPUTY DAVID CHEVEZ,

28 DEPUTY LAWRENCE SWANSON, JR. (collectively "Defendants") submit this

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax     (626) 243-1111

18782

1

opposition to Plaintiffs N.G. AND L.G., minors, by and through their Guardian ad Litem Lilliana Magallon and SARA PEREZ' ("Plaintiffs") Motion in Limine No. 1 to exclude decedent's tattoos.

## I.

## INTRODUCTION

On October 18, 2012, Deputies Lawrence Swanson and David Chevez accompanied arrestee Jilberto Gutierrez from a Los Angeles County Sheriff's Department (LASD) station jail to the Centinela Hospital Emergency Room. Earlier in the afternoon Gutierrez had been arrested—not in a traffic stop, as Plaintiffs claim—but for being a felon in possession of methamphetamine. He had a seizure-like episode while at the station jail, and was taken to the ER.

Gutierrez indicated to the nursing staff that he had used meth amphetamine in within the last two days. Dr. Arnold Sin examined him and ordered an EKG and x-rays. Gutierrez refused the tests. The deputies unhandcuffed Gutierrez' dominant right hand so he could sign an acknowledgment that he was being discharged back to jail against medical advice.

As the deputies readied to return him to the station jail, Gutierrez—who had been calm and quiet to that point—suddenly reached out with his free hand, grabbed Dep. Swanson's Beretta handgun, and violently attempted to wrest it from the holster. The deputies struggled with Gutierrez to prevent him from removing the gun. Swanson pressed down on Gutierrez' hand to keep the gun holstered, while Chevez used fists, and then baton strikes to the head to force Gutierrez to release the gun. Despite sustaining repeated strikes to his head, Gutierrez did not let go. Swanson then used his left hand to deploy pepper spray and was able to break Gutierrez' grip from the gun. Gutierrez then leapt to his feet, pulling the gurney away from the wall, and lunged for the gun with his free right hand, at which time Deputy Chevez shot him once to prevent Gutierrez from disarming Deputy Swanson, from harming the deputies, and from escaping and harming other people in the hospital.

18782

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax     (626) 243-1111

Jilberto Gutierrez was a gang member and had a number of gang-related tattoos establishing his affiliation with a gang and commitment to gang tenets as admitted to by Lilliana Magallon, plaintiffs' Guardian ad Litem and former girlfriend of decedent.  These tattoos are not only relevant, they are party admission and statements against interest inscribed on decedent's own body. When he attempted to wrest away the deputy's gun, he used a gun take-away and deploy technique commonly known among gang members and taught in prison.  Decl. Dunkerly, ¶ 5. His tattoos are evidence of his gang membership which is probative of his bias, motive, plan, and opportunity to learn this gun take-away technique within the meaning of FRE 803(3).  Further, Plaintiffs claim damages for loss of support as compensatory damages. Gutierrez' gang affiliation is evidence related to his employability as well as determining what income-dependent damages, if any, are actually recoverable.

Lastly, it is not practicable to retouch the photographs of the hospital room and decedent's body to redact the tattoos while leaving the blood spatter evidence undisturbed.  The distribution of the blood spatter is a critical component of the Defendants' reconstruction analysis.  The blood spatter and other contusions appear on the decedent's arms, hands, shins and socks.  There is also contusion on his left ribcage that is consistent with a pressure wound from the rail of the gurney caused during the struggle for Dep. Swanson's gun.  The only photograph of that contusion is a coroner's autopsy photograph in which decedent's body is fully disrobed, showing his various tattoos.

Notwithstanding that they seek the tattoos and gang-evidence excluded, Plaintiffs' counsel reserves the right to discuss tattoos to the extent that doing so would benefit their unsupported theory that the Deputies saw a tattoo on Gutierrez' chest that read "FUCK PIGS" and despite being sworn officers of the law, thereupon supposedly became so incensed that they decided to "execute" him in a public hospital with other persons in the room.  This is plaintiffs' counsel attempt to

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone (626) 243-1100
Fax     (626) 243-1111

18782

3

manufacture a sensationalized theory to inflame the passions of the jury without adequate evidence. For example, Gutierrez' torso was covered by a t-shirt and the deputies testified that they did not know what was tattooed on his chest and back. Defendants oppose Plaintiffs motion to exclude some tattoos and include others as each benefits or hurts their trial strategy.  There is nothing overtly prejudicial about decedent's gang related tattoos and any prejudice is outweighed by the probative value of decedent's gang affiliation.  These tattoos paint the full portrait of what motivations animated the decedent, the tenets of his beliefs, and his general relationship with law enforcement.

## II.

## DECEDENT'S PROVEN MEMBERSHIP IN A GANG IS RELEVANT TO OPPORTUNITY, BIAS AND DAMAGES

**1. Decedent's tattoos show his gang affiliation which is probative of his opportunity to learn a gang-taught gun take-away technique and his bias.**

Defendants are informed and believe that the Plaintiffs are going to attempt to paint this incident as an "execution style" use of force against Jilberto Gutierrez in a hospital room with other persons present.  In order for the jury to have a complete picture of what happened, it is crucial to a full and fair trial that the personality and bias of Gutierrez be brought into evidence.  The decedent was a member of a gang; he had gang tattoos.  The tattoos are evidence of Plaintiffs acceptance of the tenets of gang membership.  The tattoos are therefore relevant to his membership in a gang, such membership itself being probative of bias.  FRE 401. This includes the "Fuck Pigs" tattoo, which while not visible to the deputies, is a statement by decedent that speaks to his relationship with law enforcement. To the extent plaintiffs argue that decedent was always compliant with law enforcement, the "Fuck Pigs" tattoo is party admission to the contrary and a clear statement against interest. FRE 801 (d)(2) and FRE 804(b)(3). Moreover, the Supreme Court has held that evidence showing membership in a prison gang is sufficiently probative of bias to warrant its admission

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax     (626) 243-1111

18782

4

into evidence. *United States v. Abel*, 469 U.S. 45, 49 (1984).

Further, Gutierrez used a gun take-away and deployment technique commonly known among members of gangs and taught in jail.  Decl. Dunkerly, ¶ 5. Only Swanson and Chevez can testify to the complete sequence of events because other witnesses to the struggle only saw disjointed portions of the incident and/or had their view blocked by a privacy curtain. Therefore, it is critical to counter any accusations against the deputies with a complete picture of who the decedent was, his opportunity to learn this particular gun take-away technique, and his bias.

**2. The tattoos are also relevant to the Plaintiffs' claim for compensatory damages.**

Insofar as the tattoos are indicative of gang membership, they are also relevant to Plaintiffs claims of loss of support. (TAC, p. 17).  The fact that Gutierrez was involved in gangs is directly relevant to determining loss of support damages.  FRE 401. Illegal earnings cannot be used to calculate compensatory damages.  Gutierrez' gang membership is relevant to the calculation of his future earnings, as this affected both his past employability, and would likely have affected his future employability. At the time of his death, Mr. Gutierrez had not held a job in several years.  Lilliana Magallon, his girlfriend, the plaintiffs' guardian ad litem, testified to his gang membership.  As such, the tattoos are relevant to his gang membership, which is in turn relevant to his financial contribution to the Plaintiffs.

**3. Plaintiffs have indicated they may reference decedent's tattoo so Defendants should be permitted to discuss the evidence and rebut Plaintiffs' assertions.**

Notably, Gutierrez also had a prominent tattoo on his chest that said "Fuck Pigs." In Plaintiffs' Motion in Limine No. 1, Plaintiffs indicate that they may verbally reference this tattoo as they claim that "it relates to the Defendants' motivation." Plaintiffs have intimated that they may suggest to the jury that the deputies saw this tattoo—even though no one at the hospital or the deputies has testified in deposition to

18782

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax     (626) 243-1111

**OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1**

having seen it before the shooting—and in a fit of revenge decided to execute Gutierrez in a public hospital with witnesses nearby.  However, the deputies both testified that they did not even see this tattoo, and in any event, they testified that they are apathetic and unmoved by anti-police hate rhetoric because it is so common in their line of work.  Decl. Dunkerly, ¶ 4.  To the extent that Plaintiffs will advance their "execution" theory, Defendants should have an opportunity to address this evidence, rebut any improper inferences, and show the jury the tattoo in question—so that the jury can see that it was fully covered by decedent's clothing.

### III.

### UNMODIFIED IMAGES DEPICTING BLOOD-SPATTER EVIDENCE AND CONTUSIONS ARE PROBATIVE OF THE SEQUENCE OF EVENTS

Defendants intend to produce photographs from the homicide report and coroner's autopsy at trial to establish that the blood spatter on decedent's body is consistent with the testimony of the deputies regarding the sequence of events which resulted in his death.  Defendants also intend to produce photographs depicting contusions on the decedent's body to establish that they are consistent with the testimony of the deputies.  Decl. Dunkerly, ¶ 6.

The decedent had *numerous* tattoos on his arms, forearms, chest, legs and back.  Some of those tattoos are gang-related and some are not.  These tattoos are visible in photographs of the blood spatter evidence and contusions on the decedent's body.  Given the quantity and position of the decedent's tattoos, it would not be possible to alter the photographs to preserve the blood spatter evidence and contusions but erase or otherwise redact the tattoos on decedent's body.  Therefore, images of the decedent's tattoos should be admitted as relevant to show the physical evidence in support of the deputies' testimony of the sequence of events.

/ / /

/ / /

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax    (626) 243-1111

18782

**OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1**

## IV.

## <u>GANG AFFILIATION IS NOT UNDULY PREJUDICIAL OR IMPROPER CHARACTER EVIDENCE</u>

To the extent that Plaintiffs' claim that evidence of Gutierrez' gang membership is prejudicial, it is more probative than prejudicial.  Any misconception about the importance and weight of the gang evidence can be clarified by the Court with a limiting instruction to the jury regarding the purpose for which the evidence is being admitted.  Plaintiffs' have not identified any unfair prejudice beyond stating that gang evidence would "inflame the passions of the jury".  The decedent's tattoos are probative of bias, opportunity, and motive, as well relevant to the quantum of recoverable damages.  FRE 401. The incident photographs depicting the decedent's tattoos are probative of the sequence and reconstruction of the incident.  Therefore, the probative value of this evidence outweighs any unfair prejudice that may exist.

The tattoos and the inferences of gang membership are certain and not speculative.  Lilliana Magallon, Gutierrez' girlfriend, the guardian ad litem in the present litigation, admitted in her deposition that he was a gang member.  If the Plaintiffs would like to dispute the meaning of the tattoos, that goes to the weight of the evidence, not its admissibility.

Plaintiffs also argued that this evidence would be inadmissible hearsay, however no out of court statement has been offered for the truth of the matter asserted.  Gutierrez's gang tattoos and membership are within the personal knowledge of his girlfriend, and are clearly visible in many of the images.  Additionally Defendants' experts are able to identify those tattoos, and they may rely upon the images in forming their opinions.

/ / /

/ / /

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax    (626) 243-1111

18782

OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1

# V.

## CONCLUSION

Based upon the foregoing, Defendants respectfully requests this Court deny Plaintiffs' Motion *in Limine* No. 1 to exclude decedent's tattoos.

DATED:  July 7, 2014                    COLLINS COLLINS MUIR + STEWART LLP

By: _____

ERIN R. DUNKERLY
TOMAS A. GUTERRES
CATHERINE M. MATHERS
Attorneys for Defendants, COUNTY OF
LOS ANGELES, DEPUTY DAVID
CHEVEZ and DEPUTY LAWRENCE
SWANSON, JR.

**Collins Collins Muir + Stewart** LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax     (626) 243-1111

18782

8

**OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1**

## DECLARATION OF ERIN R. DUNKERLY, ESQ.

I, Erin R. Dunkerly, declare:

1.      I am an attorney admitted to practice before all the courts of the State of California.  I am an associate in the law firm of Collins, Collins, Muir + Stewart, LLP, counsel of record for Defendants herein, County of Los Angeles, Deputy Lawrence Swanson, and Deputy David Chevez. The following facts and circumstances are personally known to me and if called upon to do so, I could and would competently testify as to them. As to those matters stated upon information and belief, I am informed and believe them to be true.

2.      This declaration is provided in support of Defendants opposition to Plaintiffs' Motion in limine number one.

3.      Attached hereto as Exhibit "A" is a true and correct copy of relevant portions of the deposition of LASD Deputy David Chevez, Vol. 2, which was taken on March 6, 2014.

4.      Attached hereto as Exhibit "B" is a true and correct copy of relevant portions of the deposition of LASD Deputy Lawrence Swanson, Vol. 2, which was taken on March 19, 2014.

5.      I am informed and believe that Gil Jurado, Defendants' police practices expert, is familiar with police training on gun take-away techniques including techniques taught by prison gangs and can testify regarding the techniques and the department's training on appropriate responses to these situations.  He will be able to testify that Gutierrez used a gun take-away and deploy technique commonly known among gang members and taught in prison.

6.      Defendants filed an Application to Seal the Homicide Photos and the Coroner Autopsy photos, which were submitted to the Court in support of the motion for partial summary judgment now pending and are identified as exhibits by defendants for trial.  The photographs sought to be sealed are graphic in nature.  The court can discern from those photographs that decedent had many tattoos on his arms,

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax     (626) 243-1111

18782

**OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1**

forearms, chest, legs and back. Some of those tattoos are gang-related and some are not. However, the Court can also discern from the photographs that the pattern and distribution of blood on the decedent is a critical component for the reconstruction of the incident. Plaintiff's motion in limine if granted would therefore prejudice Defendants because it would not be possible and/or expensive in terms of costs and fees to Defendants to digitally alter the photographs to remove the tattoos without altering the blood spatter evidence and contusions.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed July 7, 2014, at South Pasadena, California.


_____

ERIN R. DUNKERLY

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone  (626) 243-1100
Fax      (626) 243-1111

18782

10

**EXHIBIT "A"**

David Chevez                                                                    March 6, 2014

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4

5   N.G. AND L.G., minors, by and     )
    through their Guardian ad Litem, )
6   Lilliana Magallon; SARA PEREZ,    )
                                      )
7              Plaintiffs,            )
                                      )
8          vs.                        ) Case No.
                                      ) CV13-008312-SVW
9   COUNTY OF LOS ANGELES; LEROY      ) (FFMx)
    BACA; DAVID CHEVEZ; LAURENCE      )
10  SWANSON,; and DOES 5-10,          ) Volumes II and III
                                      )
11             Defendants.            )
    _____)

12

13           - NON-CONFIDENTIAL PORTION -

14

15       VIDEOTAPED DEPOSITION OF DAVID CHEVEZ

16              Los Angeles, California

17             Thursday, March 6, 2014

18                      and

19             Friday, March 7, 2014

20

21

22

23

24  Reported by:  Elena C. Chester
                  CSR No. 10274
25  NDS Job No.:  161107 and 161155

                                              163

1              MR. CASSELMAN:  And Gary Casselman,

2      attorney for the plaintiffs and the video operator,

3      pursuant to FRCP Rule 28.  We may, later, be joined

4      by someone else, but I'll make the announcement

5      when that happens.

6              All right.  So, sir, have you --

7              MR. OGBOGU:  You need to swear him in

8      again.

9              MR. CASSELMAN:  Go ahead.

10

11                      DAVID CHEVEZ,

12         having first been duly placed under oath, was

13             examined and testified as follows:

14

15                  EXAMINATION (RESUMED)

16     BY MR. CASSELMAN:

17         Q.   Now, have you had a chance to discuss the

18     incident or your testimony with your fellow deputy

19     and co-defendant, Mr. Swanson?

20         A.   No, I have not.

21         Q.   Okay.  And have you talked to

22     Mr. Swanson, since yesterday, about this case?

23         A.   Not about the case.

24         Q.   I see.  And how did you get here this

25     morning?

                                                        170

1      A.    Yes, there is (sic).

2      Q.    Did you see a big tattoo on his chest?

3  In block letters, it said "Fuck Cops."

4      A.    I did not.

5      Q.    If you saw a tattoo like that, would that

6  upset you?

7      A.    I see them all the time.   I'm immune to

8  it.

9      Q.    But that's not responsive to my question.

10         Actually, it says -- doesn't say "Fuck

11  Cops," does it?

12     A.    I don't know what it says.

13     Q.    Well, it says "Fuck Pigs."

14         Does that upset you -- if people say

15  "Fuck Pigs"?

16     A.    Like I say, it does not.   It doesn't

17  bother me at all.

18     Q.    And you are not allowed to respond to

19  something like that, are you, according to your

20  training?

21     A.    That's definitely not professional -- if

22  you do respond to it.

23     Q.    Now, I want to ask you, before we, you

24  know, go into the other aspect of this

25  deposition -- now, have you seen -- by the way,

1    have you seen a tattoo like that before, that says

2    "Fuck Pigs"?

3         A.   Sir, I see them almost on a daily basis

4    where I work.

5         Q.   Does that -- does that, like, indicate

6    membership in some kind of a group or just

7    unhappiness with police?

8              MS. MATHERS:   Objection.   Lacks

9    foundation.

10             But if you know.

11             THE DEPONENT:   I really don't know.   I

12   would assume that the majority of the people that

13   live in the community where we work are very

14   unhappy with the police.   They have an animosity

15   towards us.   It's very common.

16        Q.   BY MR. CASSELMAN:   Did you see any

17   tattoos on Mr. Gutierrez before you shot him?

18        A.   No.

19        Q.   Did you see any tattoos on him after you

20   shot him?

21        A.   No.

22        Q.   Did you have any tattoos, yourself,

23   before you shot him?

24        A.   No.

25        Q.   And have -- besides the reaper tattoo on

                                                      293

# EXHIBIT "B"

Lawrence E. Swanson, Jr.                                                      March 7, 2014

```
 1                 UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   N.G. AND L.G., minors, by     )
     and through their Guardian    )
 6   ad Litem, Lilliana Magallon;  )
     SARA PEREZ,                    )
 7                                  )
                   Plaintiffs,      )
 8                                  )
         vs.                        )  Case No.
 9                                  )  CV13-008312-SVW (FFMx)
     COUNTY OF LOS ANGELES; LEROY   )
10   BACA; DAVID CHEVEZ; LAURENCE   )  Volume II
     SWANSON,; and DOES 5-10,       )
11                                  )
                   Defendants.      )
12   _____)

13

14

15

16      VIDEOTAPED DEPOSITION OF LAWRENCE E. SWANSON, JR.

17                  Los Angeles, California

18                 Friday, March 7, 2014

19

20

21

22

23

24   Reported by:  Elena C. Chester
                    CSR No. 10274
25   NDS Job No.:  161088
```

74

1                LAWRENCE E. SWANSON, JR.,

2        having previously been duly placed under oath,

3            was examined and testified as follows:

4

5                    EXAMINATION (RESUMED)

6    BY MR. CASSELMAN:

7        Q.    Thank you.  I think we've covered the

8    preliminaries yesterday.  Is there anything that

9    you want to change or modify or withdraw, in terms

10   of your prior testimony?

11       A.    No.

12       Q.    Very well.  Is there any reason that you

13   think we could not go forward?  Because you are not

14   feeling well or there is some other condition

15   that's affecting you.

16       A.    No.

17       Q.    All right.  Now, did you write any

18   reports about the incident, yourself?

19       A.    No, I didn't.

20       Q.    Did your partner, to your knowledge?

21       A.    Not to my knowledge.

22       Q.    And did you go out in the field with

23   Mr. Chevez after the date of the incident?

24            MS. MATHERS:  Objection.  Vague.

25            MR. CASSELMAN:  All right.

80

1      A.    Yes.

2      Q.    And he never said anything, in anger or

3   otherwise?

4      A.    I vaguely remember, after he had jumped

5   off the bed --

6            Excuse me.  Can I get some water?

7      Q.    Of course.

8      A.    When he jumped off of the bed -- and he

9   yanked on that -- that railing that was handcuffed

10  (sic) -- I vaguely remember him yelling

11  something -- some type of curse word, but I don't

12  recall exactly the words used.  That was the only

13  time.

14     Q.    Does that appear in any statement that

15  you've given in this matter:  that he yelled

16  something?

17     A.    I believe so.

18     Q.    And -- now, when -- let me back up.

19            Did you watch the -- the person that came

20  in to give Mr. Gutierrez an EKG -- that would be

21  someone doing something like you used to do;

22  right?

23     A.    Correct.

24     Q.    And so that EKG tech -- were you watching

25  what he was doing, out of curiosity as well as

97

1    professional interest?

2         A.   No.

3         Q.   All right.  (Unintelligible.)

4              (Reporter's request for clarification.)

5         Q.   Why were you watching?

6         A.   (No audible response.)

7              (Conference held, off the record, between

8         Mr. Casselman and Mr. Ogbogu.)

9         Q.   BY MR. CASSELMAN:  Now, did you come into

10   the room at some point in time before the EKG tech

11   left?

12        A.   Not that I recall.

13        Q.   Did you ever see any involvement of

14   Mr. Gutierrez and the EKG tech?

15        A.   Not that I recall.

16        Q.   Now, if a person was wearing a T-shirt,

17   how would you, as a trained EKG tech, attach the

18   electrodes to that person?

19        A.   I would put it -- electrodes on each arm,

20   each leg or the lower hip and then put the

21   electrodes on the chest, around the left breast and

22   to the midaxillary line, which would be the middle

23   of the armpit line (indicating).

24        Q.   And you would attach those electrodes to

25   the skin; correct?

98

1        Q.    Was there some way you decided who would

2    stay and who would go?

3        A.    Not that I recall.

4        Q.    And did you walk inside and see

5    Mr. Gutierrez with electrodes on his chest?

6        A.    I don't recall seeing any electrodes on

7    his chest.

8        Q.    Would you believe that the events were

9    fresher in your mind when you gave the statement to

10   the investigators from your Department than they

11   would be now, since there's been a passage of a

12   significant amount of time?

13       A.    I believe so.

14       Q.    Okay.  And so, if --

15             Referring Counsel to -- do you have the

16   transcript?  No?

17             Well, in any event, if you said:

18   "... then I walked inside, and my partner had -- I

19   noticed he had handcuffed the inmate with both

20   hands, and the inmate had electrodes, like,

21   those -- those stickers they use for EKGs.  He had

22   electrodes on his chest," would -- do you recall

23   saying that?

24       A.    Vaguely, yeah.

25       Q.    Would you like to review the certified

                                                        100

```
 1   page, too, if you like, to satisfy yourself.

 2           MS. MATHERS:  No.  I just want a copy of

 3   the certified transcript.  That's all.

 4           MR. CASSELMAN:  Right.

 5           (Brief pause in proceedings.)

 6           MS. MATHERS:  Okay.

 7      Q.   BY MR. CASSELMAN:  All right.  Having

 8   reviewed that, sir, does that appear to be an

 9   accurate record of what you said?  I mean, we can

10   play the audio, but I'll represent to you that we

11   had a reporter, certified reporter, who has no

12   interest in this case, transcribe this.

13           MS. MATHERS:  Well, I don't want him

14   attesting to the authenticity of the transcript

15   until he's had an opportunity to review the entire

16   transcript and the recording.

17           MR. CASSELMAN:  I'm just talking about

18   that statement.

19           MS. MATHERS:  If he recalls that being

20   what he's said, that's fine.  Otherwise, we can

21   check the recording to the transcript later.

22      Q.   BY MR. CASSELMAN:  Well, let me ask you

23   this, sir, at this time.  Having read that, does

24   that refresh your recollection of what you saw in

25   the room -- of Mr. Gutierrez with electrodes on his
```

                                                          102

1    chest, as reported, and with being handcuffed, both

2    hands, to the bed?

3        A.   I do recall the -- both handcuffs being

4    handcuffed to the bed.  I do remember seeing

5    stickers.  I remember seeing a sticker -- I thought

6    it was on his arm.  I'm sorry.  Electrode.  And as

7    far as the chest, I don't recall, but -- yeah, I

8    don't recall.

9        Q.   But if you gave the statement closer in

10   time, would it be fair to say that you probably had

11   a better recollection on October 18, 2012, than you

12   do on March 7, 2014?

13       A.   Yes.

14       Q.   All right.  And when you did observe --

15   do you have any current recollection of seeing

16   Mr. Gutierrez with electrodes on him?

17       A.   Just what I just told you.

18       Q.   And was Mr. Gutierrez saying or doing

19   anything when you made that observation of him?

20       A.   No.

21       Q.   All right.  So it's not like he was

22   struggling against his restraints?

23       A.   No.

24       Q.   He was just laying there?

25       A.   Yes.

103

```
 1              time.)

 2         Q.    BY MR. CASSELMAN:  Would it be above or

 3    below the nipple line?

 4         A.    Both.

 5         Q.    And how many stickers would there be on

 6    the chest area?

 7         A.    Typically, during an EKG tech -- test,

 8    there would be four, five, six, seven, eight,

 9    nine -- 10?  Approximately 10.

10         Q.    And that's in addition to the ones on the

11    limbs?

12         A.    No.  That includes the limbs.

13         Q.    All right.  Well, I'm asking just about

14    the chest.

15         A.    So then it would be six.

16         Q.    All right.  A moment please.

17               Did you see any part of Mr. Gutierrez's

18    torso?

19         A.    Not that I can recall.

20         Q.    I'm going to show you -- I'm going to

21    show you what's been marked as County of L.A. 0338.

22               Showing your counsel first.

23               Are you familiar with that photograph?

24         A.    No, sir.

25         Q.    Are you familiar with what it depicts?
```

110

Lawrence E. Swanson, Jr.                                          March 7, 2014

1        A.   I can assume what it depicts.

2        Q.   Well, I don't want you to assume

3   anything.  Are you saying that you've never seen

4   any view of that torso before?

5        A.   No, sir.

6        Q.   And --

7             MS. MATHERS:  I think you asked a double

8   negative there.

9             MR. CASSELMAN:  All right.

10       Q.   Have you ever seen that body -- that

11  person's body before?

12       A.   It doesn't look familiar, sir.

13       Q.   And have you ever seen any tattoos like

14  that on the date of the incident?

15       A.   Not that I recall.

16       Q.   Well, let me ask you, sir, how would it

17  be possible to -- I want you to assume that that's

18  Mr. Gutierrez, and that these pictures were taken

19  by your Department --

20       A.   Uh-huh.

21       Q.   -- after he was killed.

22            Can you tell me -- and actually, take a

23  pen and mark where, as an EKG tech, you would

24  attach electrodes -- or where they would routinely

25  be attached -- to the chest area of that torso.

                                                         111

1    above that?

2            How would you see those electrodes

3    without seeing the tattoo?

4        A.   I could see those electrodes without

5    seeing that tattoo by the shirt collar -- the line

6    that comes down.  In fact, if was common practice

7    where we would -- in the emergency room, where

8    people would come in still wearing their normal

9    clothes -- that we would actually put these first

10   two without raising their shirt, just to provide

11   extra privacy -- in those first two positions.  And

12   then, because a lot of people feel uncomfortable

13   about showing their nipple line, we would lift the

14   shirt up here (indicating) to place the rest of the

15   ones while keeping their nipples covered to allow

16   privacy for the patient.

17           So I can see the two in the chest,

18   commonly, by the shirt line -- the collar line

19   coming down.  And then -- so that's how I would be

20   able to see electrodes on the chest without

21   actually seeing this tattoo (indicating).

22           MR. CASSELMAN:  Indicating the "Fuck

23   Pigs" tattoo.

24       Q.   So the shirt would have to be lifted to

25   place the Electrodes 3, 4, and 5, as we've

                                                     116

```
 1    described them?

 2              MS. MATHERS:  Do you want him to number

 3    it on the page, so we have a number of what's 1, 2,

 4    3, 4 and 5?

 5              MR. CASSELMAN:  Well, I made a record

 6    that we start from the left side of the picture --

 7    and the right side, just to the right of the

 8    decedent's sternum, and then we move

 9    clockwise to --

10              MS. MATHERS:  I was just asking if you

11    wanted him to write it on the page.  Doesn't matter

12    to me whether you do or don't.

13              MR. CASSELMAN:  No.  No, I don't.

14              MS. MATHERS:  Okay.

15        Q.   BY MR. CASSELMAN:  So it's your testimony

16    that the -- do you recall what position the shirt

17    was in, or if it was even on his body?

18        A.   I don't ever recall him taking his shirt

19    off.  I recall the shirt being on the entire

20    time.

21        Q.   Right.  Well, if he was handcuffed, he

22    wouldn't be able to do any removal of his own

23    shirt, would he?

24        A.   I don't believe so.  No.

25        Q.   And do you recall if -- do you recall if
```

117

Lawrence E. Swanson, Jr.                                        March 7, 2014

1    he had a T-shirt on when you saw the electrodes?

2    Or you don't remember one way or the other?

3         A.   I still can't recall.

4         Q.   All right.  Well, do you think, if you

5    saw a big tattoo with that "Fuck Pigs" on it, that

6    you'd remember it now?

7         A.   Yes, I do.

8         Q.   And what else does it say or depict that

9    you can recognize from viewing it?

10        A.   You want me to just tell you what tattoos

11   I see on here?

12        Q.   Yes, sir.

13        A.   I see "South Side."  I see a horned

14   creature.  I see a "Fuck Pigs."  And I see what

15   looks like "Tiny" -- "Tiny" -- something.  A word

16   that starts with G-e.

17        Q.   And it's your testimony that you saw none

18   of that prior to looking at this picture?

19        A.   Correct.  None of these look familiar to

20   me at this time.

21        Q.   Do you have any reason to believe that at

22   an earlier time, you had seen that and you just

23   forgot?

24        A.   No, not that I recall -- seeing that.

25             MR. CASSELMAN:  I need a moment off the

                                                          118

Lawrence E. Swanson, Jr.                                          March 7, 2014

1    STATE OF CALIFORNIA        )
                                )  ss:
2    COUNTY OF LOS ANGELES      )

3

4           I, ELENA C. CHESTER, do hereby certify:

5           That I am a duly qualified Certified Shorthand

6    Reporter, in and for the State of California, holder of

7    certificate number 10274, which is in full force and

8    effect and that I am authorized to administer oaths and

9    affirmations;

10          That the foregoing deposition testimony of the

11   herein named witness was taken before me at the time and

12   place herein set forth;

13          That prior to being examined, the witness named

14   in the foregoing deposition, was duly sworn or affirmed

15   by me, to testify the truth, the whole truth, and

16   nothing but the truth;

17          That the testimony of the witness and all

18   objections made at the time of the examination were

19   recorded stenographically by me, and were thereafter

20   transcribed under my direction and supervision;

21          That the foregoing pages contain a full, true

22   and accurate record of the proceedings and testimony to

23   the best of my skill and ability;

24          That prior to the completion of the foregoing

25   deposition, review of the transcript was requested.

234

Lawrence E. Swanson, Jr.                                      March 7, 2014

1          I further certify that I am not a relative or

2     employee or attorney or counsel of any of the parties,

3     nor am I a relative or employee of such attorney or

4     counsel, nor am I financially interested in the outcome

5     of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8     this _____ day of _____, _____.

9

10

11          _____

12          ELENA C. CHESTER, CSR No. 10274

13

14

15

16

17

18

19

20

21

22

23

24

25

235